IN THE SUPREME COURT OF NORTH CAROLINA

No. 329A19

Filed 17 July 2020

IN THE MATTER OF: K.L.T.


Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 8 May 2019 by Judge Betty J. Brown in District Court, Guilford County. This matter was calendared for argument in the Supreme Court on 19 June 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Mercedes O. Chut for petitioner-appellee Guilford County Department of Health and Human Services.*

*Rosenwood, Rose & Litwak, PLLC, by Nancy S. Litwak, for appellee Guardian ad Litem.*

*David A. Perez for respondent-appellant mother.*

DAVIS, Justice.

Respondent-mother appeals from the trial court's order terminating her parental rights in her son K.L.T. (Kirk),[1] who was born in March 2011. Although the trial court's order also terminates the parental rights of Kirk's father (respondent-father), he is not a party to this appeal. Based on our determination that the trial

---

[1] We use pseudonyms and initials throughout this opinion in order to protect the privacy of the juveniles referenced herein.

court erred in concluding that grounds existed to terminate respondent-mother's parental rights, we reverse.

**Factual and Procedural Background**

Respondent-mother, who is legally blind, has five children. Kirk is her youngest child and the sole offspring of her marriage to respondent-father, who was her third husband and whom she divorced in April 2018. Mr. L., respondent-mother's second husband, is the father of her four eldest children, Jack, Brooke, Becky, and Justin. Jack and Brooke were no longer minors when these proceedings commenced, and Becky attained the age of majority in May 2017.

On 26 August 2016, the Guilford County Department of Health and Human Services (GCDHHS) obtained nonsecure custody of Becky, Justin, and Kirk and filed juvenile petitions alleging that they were abused, neglected, and dependent juveniles. The juvenile petition filed by GCDHHS regarding Kirk summarized the family's "extensive" Child Protective Services (CPS) history in Orange County dating back to 2004, which included "numerous substantiated neglect reports against [respondent-father] for inappropriate discipline of . . . [Becky] and [Justin]" and against respondent-mother "because she was complicit in [respondent-father's] inappropriate discipline of her children."

The juvenile petition first summarized three CPS reports made about the family in March and April of 2016, each of which was investigated and substantiated by GCDHHS. These reports described the physical abuse of Brooke, Becky, Justin,

and Kirk by respondent-father. One report alleged that respondent-father "beats four-year-old [Kirk] with items such as hangers, a broom, and a wooden back scratcher," leaving visible bruises on the child. Another report alleged that respondent-father had physically and sexually assaulted respondent-mother's cognitively-impaired adult daughter, Brooke. Respondent-father admitted to a GCDHHS social worker in March of 2016 that he had engaged in oral sex with Brooke. When the social worker questioned respondent-mother about the incident, she acknowledged that respondent-father's sexual abuse of Brooke was "wrong" but also blamed Brooke for "sitting on [respondent-father's] lap and moving around."

The juvenile petition next recounted GCDHHS's efforts to work with the family before taking the minor children into custody in 2016. For example, when respondent-father refused to leave the home, GCDHHS provided a hotel room for respondent-mother and the children. In addition, the juvenile petition alleged that respondent-mother had refused to seek a domestic violence protective order (DVPO) against respondent-father, violated her GCDHHS safety plan by allowing respondent-father to drive her to one of Becky's medical appointments, and "coached [Becky] on what to say to the CPS Investigator."

The juvenile petition also alleged that GCDHHS received a report that respondent-father had confined the family to a bedroom in the residence and demanded to know who had made the CPS reports. The episode was overheard by Brooke's therapist, who was on speakerphone with Brooke as it happened.

Respondent-mother initially denied the report during a family meeting with GCDHHS but later admitted she was "intimidated by [respondent-father] and did not tell the truth during the meeting."

The juvenile petition further detailed an incident occurring at a Child and Family Team Meeting on 23 August 2016 in which respondent-father denied any abuse of the children and physically assaulted a social worker in the presence of Justin, Kirk, and respondent-mother. The juvenile petition accused respondent-father of abusing the children and of "perpetrat[ing] domestic violence against [respondent-mother], in particular by exerting power and control over her, isolating her, and physically assaulting her." Respondent-mother was depicted as contributing to an injurious home environment "due to [her] enabling of [respondent-father's] behavior, her repeated refusal to leave him, and her failure to protect the children."

After the children were taken into GCDHHS custody, respondent-mother entered into a case plan with GCDHHS on 3 October 2016, requiring her to address the issues of domestic violence, mental and emotional health, and parenting skills, and requiring her to maintain suitable housing. At a hearing on 19 October 2016, respondent-mother, respondent-father, and Mr. L. stipulated to facts consistent with the allegations contained in the juvenile petitions and consented to the children being adjudicated as neglected and dependent juveniles. At the hearing, GCDHHS dismissed the allegations of abuse. By order entered 14 November 2016, the trial court adjudicated Becky, Justin, and Kirk to be neglected and dependent juveniles

and ordered that the children remain in GCDHHS custody. The trial court awarded respondent-mother one hour per week of supervised visitation with each of the children and ordered her to comply with the requirements of her case plan.

In its adjudication and disposition order, the trial court noted that Kirk had been suspended from kindergarten for violent behavior and was hospitalized in September 2016 after "reporting that he was hearing voices." At the time of the adjudication and disposition hearing on 19 October 2016, Kirk had begun trauma-based therapy and was diagnosed with attention deficit hyperactivity disorder and oppositional defiant disorder. The trial court found that Kirk "require[d] continued redirection and constant supervision" from his foster parents and that GCDHHS was "exploring a higher level of care for [Kirk] due to his placement and mental health needs." In order to meet his need for a higher level of care, Kirk was moved to a new therapeutic foster home on 14 November 2016.

The trial court held seven permanency planning review hearings between 14 December 2016 and 6 February 2019. During this interval, Becky aged out of juvenile court jurisdiction, and the court granted Mr. L. full custody of Justin and terminated its jurisdiction over him pursuant to N.C.G.S. § 7B-911. In addition, respondent-mother separated from respondent-father in October 2016 and obtained a divorce judgment on 2 April 2018. Respondent-mother also successfully sought a DVPO against respondent-father on 22 February 2017 and renewed the DVPO through February 2021.

With regard to Kirk, the trial court initially established a primary permanent plan of reunification with a concurrent secondary plan of adoption. After concluding that further reunification efforts with respondent-father would be futile, the trial court changed Kirk's primary permanent plan to reunification with respondent-mother on 29 August 2017. At the next permanency planning review hearing on 10 January 2018, however, the trial court found that respondent-mother "has not made adequate progress within a reasonable period of time under [her case] plan." The trial court changed Kirk's primary permanent plan to adoption with a concurrent secondary plan of reunification with respondent-mother and ordered GCDHHS to initiate termination of parental rights proceedings as to both parents.

GCDHHS filed a petition seeking the termination of both respondents' parental rights with regard to Kirk on 25 June 2018 on the grounds of neglect and dependency. The trial court held a hearing on 26 and 27 March 2019 and entered an order terminating respondents' parental rights on 8 May 2019. The trial court found that although respondent-mother had complied with the formal requirements of her case plan, a likelihood of future neglect existed due to: (1) her history of domestic violence and abusive partners; (2) her questionable new online relationship; (3) her failure to meaningfully engage in therapy; and (4) her failure to exercise control over her household environment. The trial court also concluded that termination of respondent-mother's parental rights was proper based on the ground of dependency.

Finally, the trial court determined that the termination of her parental rights was in Kirk's best interests. Respondent-mother filed a notice of appeal.

**Analysis**

On appeal, respondent-mother argues that the trial court erred in finding the existence of grounds to terminate her parental rights to Kirk based on neglect and dependency. She further asserts that the trial court erred in concluding that it was in Kirk's best interests that her parental rights be terminated. *See* N.C.G.S. § 7B-1110(a) (2019).

A proceeding to terminate parental rights is comprised of an adjudicatory phase and a dispositional phase. "We review a trial court's adjudication under N.C.G.S. § 7B-1111 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.' " *In re E.H.P.*, 372 N.C. 388, 392, 831 S.E.2d 49, 52 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984)). It is well established that "[f]indings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal. Moreover, we review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58–59 (2019). We review the trial court's conclusions of law de novo. *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019). With regard to the dispositional phase, the trial court's determination of whether termination of parental rights is in the juvenile's best

interests is reviewed under an abuse of discretion standard. *In re E.H.P.*, 372 N.C. at 392, 831 S.E.2d at 52.

## I.    Adjudication of Neglect

Under subsection 7B-1111(a)(1), the trial court may terminate the parental rights of a parent if "[t]he parent has . . . neglected the juvenile." N.C.G.S. § 7B-1111(a)(1) (2019). The Juvenile Code defines "[n]eglected juvenile" as a minor child "whose parent . . . does not provide proper care, supervision, or discipline . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2019). In order to constitute actionable neglect, the conditions at issue must result in "some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment." *In re Stumbo*, 357 N.C. 279, 283, 582 S.E.2d 255, 258 (2003) (citations omitted).

"The petitioner seeking termination [under N.C.G.S. § 7B-1111(a)(1)] bears the burden of showing by clear, cogent and convincing evidence that such neglect exists at the time of the termination proceeding." *In re Ballard*, 311 N.C. 708, 716, 319 S.E.2d 227, 232 (1984). Our case law makes clear that "if the child has been separated from the parent for a long period of time [at the time of the termination hearing], there must be a showing of past neglect and a likelihood of future neglect by the parent." *In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167 (2016). "The determinative factors must be the best interests of the child and the fitness of the

parent to care for the child *at the time of the termination proceeding.*" *In re K.N.*, 373 N.C. 274, 282, 837 S.E.2d 861, 867 (2020) (citation omitted).

The trial court found that Kirk was adjudicated to be neglected in 2016 and that there was a "strong likelihood of the repetition of neglect" if Kirk was returned to respondent-mother's care due to her "inability to demonstrate an ability to correct the conditions that led to removal." Specifically, the trial court found that respondent-mother's behavior indicated a likelihood of future neglect due to: (1) her history of domestic violence and abusive partners; (2) her questionable new online relationship; (3) her failure to meaningfully engage in therapy; and (4) her failure to exercise control over her household environment.

Respondent-mother concedes Kirk's prior adjudication of neglect but challenges the trial court's finding as to the likelihood of a repetition of neglect. Respondent-mother also takes exception to many of the trial court's evidentiary findings in support of the adjudication of neglect. We review her arguments in turn.

### A. Findings of Fact

#### 1. Completion of Case Plan

Respondent-mother first challenges the trial court's finding that she did not fully comply with the requirements of her case plan. Respondent-mother's 2016 case plan required her to address deficiencies in her parenting skills, housing and employment, mental and emotional health, and domestic violence issues. We agree

with respondent-mother that the record demonstrates that she completed each of these requirements.

Specifically, she (1) successfully completed a twelve-session domestic violence support group on 30 January 2017; (2) obtained a psychological evaluation and parenting assessment on 3 November 2016 by a clinical psychologist, Michael A. McColloch, Ph.D., who did not recommend any additional treatment; (3) completed the Parent Assessment Training and Education (PATE) program; (4) completed outpatient therapy with Tabitha McGeachy at Peculiar Counseling & Consulting, PLLC, on 2 March 2017, accomplishing all treatment goals with no additional treatment recommended; (5) completed two courses of outpatient psychotherapy from May to September of 2017 and from May to November of 2018 with Joanna Hudson, LCSW, at Family Service of the Piedmont, Inc., who did not recommend any further therapy; (6) separated from respondent-father and obtained a judgment of divorce on 2 April 2018; (7) obtained a DVPO against respondent-father on 22 February 2017 and renewed the DVPO through February 2021; (8) maintained stable income through monthly disability benefits and part-time employment as a musician at her church; (9) moved into a three-bedroom townhouse appropriate for Kirk on 29 May 2017; (10) consistently attended visitation, engaged in appropriate interactions with Kirk, complied with suggestions made by her visitation supervisor, and demonstrated no significant defects in her parenting techniques; (11) attended Kirk's school meetings and otherwise participated in shared parenting with his foster parents; and

(12) remained current on her monthly child support obligation of $291.08, which began on 1 July 2018. Thus, the record shows respondent-mother's compliance with each requirement set out in her case plan.

### 2. Domestic Violence and Personal Relationships

Respondent-mother next contests the trial court's findings of fact regarding her tendency to fall victim to abusive and unsafe relationships. Specifically, she challenges findings of fact 31, 32, 37, and 42 in which, in part, the trial court voiced its concerns regarding a new online relationship into which she had recently entered. The trial court made the following findings regarding respondent-mother's online relationship with a former high school classmate, Milton Leon Westray, who lived in Philadelphia, Pennsylvania:

> 31. . . . In December 2017, GCDHHS confirmed with the Mother that the Mother was in a new relationship. The Mother explained she was involved in an online relationship with a former high school classmate by the name of Milton Leon Westray. When GCDHHS researched Mr. Westray using the name, date of birth and place of birth provided by the Mother, GCDHHS received a report indicating that Milton Leon Westray was deceased. After receiving this information, the Mother conducted an independent search and obtained the same result. The Mother ultimately decided that the deceased was her classmate's father. However, Mr. Westray and his father do not share the same birth date. The Mother could not account for this discrepancy and continues to pursue this online relationship.
>
> 32. The Mother cannot account for the discrepancy in birth dates because she has not demanded an explanation from Mr. Westray. The Mother's actions are singularly focused on her romantic pursuits. She married

her third husband [, respondent-father,] eighteen months after divorcing her second husband. She entered into th[e] relationship [with Mr. Westray] prior to ending the marriage with [respondent-father] and describes her current relationship as "developing." Perhaps, the Mother has not questioned Mr. Westray because she would then be required to make a decision. The Mother is deserving of a logical and verifiable response. If such a response is not forthcoming, the Mother should end the relationship, period. The Mother does not appear motivated to forego romantic liaisons until her circumstances are stable.

. . . .

37. . . . The Mother has shown a selfish preoccupation with her romantic attachments even when those attachments are unhealthy and harmful to the Mother and her children. The Mother's mindless attachments will in all likelihood subject [Kirk] to repeated harm and result in [his] eventual removal. . . .

. . . .

42. . . . Although the Mother initiated divorce proceedings, obtained a 50-B Domestic Violence Protective Order and renewed the protective order twice, the [c]ourt is concerned about the Mother's involvement in yet another relationship since the juvenile's removal in 2016 without addressing adverse issues from her prior relationships. The concerns and red flags raised in this new relationship causes the Court to question the Mother's judgment. . . .

The trial court relied heavily on the existence of this online relationship as a basis for its determination that respondent-mother was likely to repeat her prior neglect of Kirk. Respondent-mother objects to these findings of fact, arguing that they are unsupported by the evidence of record, insofar as they (1) depict her response to the concerns raised by GCDHHS about Mr. Westray, and (2) extrapolate more

broadly about her judgment and priorities. We agree with respondent-mother that key portions of the trial court's findings of fact concerning Mr. Westray—and the inferences drawn by the trial court therefrom—are unsupported by the evidence. Because of the great weight placed by the trial court on this relationship, we deem it appropriate to discuss this issue in some detail.

The evidence shows that, upon being informed of respondent-mother's new online relationship, GCDHHS obtained from her the man's full name, Milton Leon Westray, and date of birth, which was in August 1966. Using this information, GCDHHS requested a nationwide criminal record check and received a report indicating that a Milton Westray, a/k/a, *inter alia*, "Westray, Milton L Jr.," died on 19 May 2012. We note, however, that the report lists two different dates of birth for the deceased Milton Westray: "08/XX/1966" and "03/1959." Moreover, the report purports to be based on information derived from credit reporting services, such as Experian, as well as e-mail and phone records and an obituary—rather than from any official government source.[2]

---

[2] Despite GCDHHS's repeated references during the termination hearing to a "death certificate," there is no evidence suggesting that GCDHHS ever obtained the deceased Mr. Westray's death certificate or any other official record to confirm its belief that respondent-mother had fallen victim to an online impostor. Aside from the results of the criminal record search, which are based on unofficial sources and list two different birthdates for the deceased Mr. Westray, the record contains only a two-line death notice for "Milton Westray" published on Philly.com. This notice makes no reference to the decedent's date of birth or any other identifying information.

When respondent-mother was presented with GCDHHS' concerns, she "conducted an independent search" into the death of Milton Westray but did not obtain the same result as GCDHHS. To the contrary, respondent-mother's research led her to conclude that the Milton Westray who died in May 2012 was her friend's father—Milton L. Westray, *Sr*. Her search revealed that although the two men "[had] the same name," they were two different individuals with different birthdates.[3]

In addition, she testified that she did, in fact, confront her online correspondent with GCDHHS's concerns. In response, he provided her with copies of his driver's license and birth certificate, and she provided these items to GCDHHS. Respondent-mother also stated that she asked Mr. Westray to appear at the termination hearing in order to prove his identity but that he could not afford to travel to North Carolina. Her counsel also offered to have Mr. Westray testify by telephone from a local department of social services office in Philadelphia, but both GCDHHS and the guardian *ad litem* objected to the use of this procedure.

In addition to the lack of any official record that would have enabled the trial court to definitively conclude that respondent-mother's online correspondent was an impostor, we are of the view that the larger inferences drawn by the trial court about

---

[3] The trial court was, of course, not required to accept respondent-mother's testimony as credible. However, the termination order does not contain any indication that the trial court chose to disbelieve her testimony on this issue or as to the other issues relied upon by the trial court in concluding that termination was warranted. Instead, at times, the termination order either ignores respondent-mother's testimony altogether or fails to characterize it accurately.

respondent-mother's character, motivations, and judgment do not flow from the evidence in the record. The record is devoid of any indication that respondent-mother's online communications with Mr. Westray posed any risk to Kirk. Respondent-mother testified that Mr. Westray has not asked her to provide any financial or other private information, Mr. Westray has never tried to take advantage of her in any way, and that the two have no current plans to meet in person. GCDHHS lacks the authority to prohibit respondent-mother from engaging in social interaction in the absence of any legitimate basis for believing that such interaction was likely to cause harm to Kirk, and such evidence was absent here. Moreover, the evidence shows that respondent-mother did, in fact, take steps to address the concerns that GCDHHS had about Mr. Westray. Accordingly, we agree with respondent-mother that the evidence regarding this issue does not support the trial court's conclusion that there was a likelihood of future neglect.

### 3. Mental and Emotional Health

Respondent-mother also challenges certain findings of fact by the trial court related to the mental and emotional health component of her case plan. After acknowledging respondent-mother's successful completion of an initial course of psychotherapy with Ms. Hudson in September 2017, the trial court found as follows:

> 29. The Mother returned to out-patient therapy with Ms. Hudson on May 5, 2018 and was discharged on November 4, 2018 after nine additional sessions. During these sessions, the Mother addressed parenting in the wake of domestic violence and verbalized her understanding of potential issues that might arise for her

> children due to their exposure to domestic violence. *However, the Mother did not discuss with her therapist, Ms. Hudson, that at a prior hearing, in the underlying case, the Mother defended her beliefs about the culpability of her cognitively impaired daughter's actions regarding the sexual assault by [respondent-father] and concluded her cognitively impaired daughter was partly responsible for the sexual assault.* The Mother also failed to discuss her three failed marriages, two of which[ ] were with men who exhibited aggression and subjected the Mother and her children to physical and emotional abuse. The Mother married [respondent-father] just eighteen months after she divorced her second husband. The Mother's involvement in her current relationship [with Mr. Westray] began prior to her divorce from [respondent-father]. *The Mother's choice in partners and hurried attachments are issues requiring in-depth therapy to avoid repeated mistakes.*

(Emphases added.) Respondent-mother takes exception to the italicized portions of this finding of fact.

In her report dated 16 October 2018, respondent-mother's therapist, Ms. Hudson, stated that "[i]t is my assessment that [respondent-mother] has engaged in meaningful conversations about the effect that domestic violence has had on her family, as well as the initial concern that she somehow held her then-teenage daughter responsible for the sexual abuse perpetrated by an adult in the home." Similarly, Ms. Hudson testified at the termination hearing as follows:

> Q.    . . . Did [respondent-mother] tell you that she had come to court and testified that originally she blamed her daughter as part of the reason why her husband, [respondent-father], sexually assaulted her daughter?
>
> A.    I don't recall if I learned about that from her or from the [GCDHHS] referral or where I got that information.

Q.      Did you all talk about it?

A.      That [it] was a concern, yes.

Q.      And what did she say?

A.      That she does not hold her daughter responsible for what happened to her.

Q.      Did you ask her then why did she testify to that in court?

A.      We did not discuss her testimony. We were just discussing [the] issue.

Respondent-mother testified that she believed with "99 percent" certainty she had, in fact, discussed this issue in therapy with Ms. Hudson and she recalled explaining to Ms. Hudson that she had been "scared at the time just by the nature of the type of person [respondent-father] was." In any event, even if there was evidence to support the trial court's findings of fact concerning whether respondent-mother and Ms. Hudson specifically discussed her prior testimony regarding the culpability of her daughter for the abuse committed by respondent-father, the undisputed testimony of both respondent-mother and Ms. Hudson demonstrates that they *did* discuss the key underlying issue that respondent-mother's daughter was not responsible for the sexual abuse.

Respondent-mother next contends that there is no evidence to support the trial court's finding that her "choice in partners and hurried attachments are issues requiring in-depth therapy to avoid repeated mistakes." We agree. To be sure, the

evidence shows that respondent-mother has been divorced three times and that her two most recent husbands, Mr. L. and respondent-father, were abusive. However, none of the treatment professionals who worked with respondent-mother on the subjects of domestic violence, mental and emotional health, or parenting believed she needed additional treatment in order to avoid such abusive relationships in the future. Moreover, the evidence concerning respondent-mother's actions since separating from respondent-father in October 2016 does not support a finding that she is in danger of repeating her past mistakes in tolerating domestic violence or abuse. To the contrary, the evidence showed that she took appropriate action by divorcing respondent-father and obtaining a DVPO against him.

Respondent-mother also challenges the following finding of fact regarding her therapy:

> 42.    . . . Although the Mother has participated in individual therapy, there is no clear, convincing evidence that the Mother has incorporated the knowledge or techniques obtained through therapy into her everyday life. It is concerning to this [c]ourt that Ms. Hudson, the therapist, indicated that there were pertinent issues that were not discussed during the course of the therapeutic relationship between the Mother and the therapist. The [c]ourt expressed its concern that if the therapist were not given a full, true and complete picture of the issues that led to the juvenile's removal from the home, those issues and concerns were not addressed and still exist. . . .

Once again, we find merit in respondent-mother's arguments. A faulty premise underlies the trial court's finding that "there is no clear, convincing evidence" of respondent-mother's successful integration of the lessons she learned during therapy

into her daily life. Under N.C.G.S. § 7B-1109(f), it was GCDHHS's burden—as petitioner—to prove by clear, cogent, and convincing evidence the existence of facts establishing grounds for the termination of respondent-mother's parental rights under N.C.G.S. § 7B-1111(a). It was not respondent-mother's burden to prove that such grounds did *not* exist.

Moreover, evidence was presented that respondent-mother (1) divorced and ceased all contact with respondent-father; (2) relocated from an isolated rural area in Brown Summit, North Carolina, to the city of Greensboro, where she has ready access to transportation (via the city bus system); and (3) cultivated an additional social support network by joining the board of directors of a local disability rights organization. Respondent-mother also devoted many hours—with the assistance of Ms. Hudson—to developing a detailed safety plan for Kirk in anticipation of regaining custody of the child.

We discern no evidence in the record supporting the trial court's assertion that respondent-mother's progress in therapy was hindered by her failure to discuss with her therapist specific aspects of her CPS history or her past relationships in the precise manner referenced by the trial court. None of respondent-mother's treatment providers believed she required additional therapy, and their testimony and reports indicate that they addressed with her the issues that led to Kirk's removal from her custody.

### 4. Parenting Skills

Respondent-mother next challenges the trial court's findings of fact concerning her parenting skills. The trial court made the following findings of fact with regard to this issue:

> 30. Prior to a hearing in October 2018, GCDHHS informed the Mother that [respondent-father] had notified GCDHHS that he was going to attend the hearing. GCDHHS recommended to the Mother that she advise her daughter [, Brooke,] of [respondent-father's] intentions and encourage the daughter to stay away since the daughter had been sexually assaulted by [respondent-father]. The Mother did not elect to act on the recommendation of [GCDHHS]. The Mother's explanation as to why she did not act on [GCDHHS's] recommendation caused the [c]ourt grave concerns as to the Mother's ability to protect any juvenile.
>
> . . . .
>
> 37. The Mother has not demonstrated the ability to care for the juvenile without GCDHHS'[s] involvement. The Mother has shown a selfish preoccupation with her romantic attachments even when those attachments are unhealthy and harmful to the Mother and her children. The Mother's mindless attachments will in all likelihood subject the juvenile to repeated harm and result in the juvenile's eventual removal. . . .
>
> 38. The juvenile has been in the custody of GCDHHS since August 26, 2016 and the Mother has only progressed to supervised visitation.

Respondent-mother challenges the trial court's finding that she disregarded GCDHHS's recommendation to discourage Brooke from attending the hearing in October 2018, which respondent-father was expected to attend. Respondent-mother testified that she "told [Brooke and Becky] not to come" to the hearing, "but they

insisted on coming." Neither GCDHHS nor the guardian *ad litem* has identified any evidence in the record contradicting respondent-mother's testimony on this issue, nor have we located any such evidence.

The record does support the trial court's finding that respondent-mother was never allowed unsupervised visitation with Kirk during the pendency of this case. But, as respondent-mother observes, she "could not force the trial court to give her unsupervised visits with her child" despite having complied with her case plan and having displayed appropriate parenting techniques in her supervised visitations with Kirk.

The record shows that the trial court temporarily suspended Kirk's visitations with respondent-mother and his siblings in 2017 on the recommendation of Kirk's therapist. The therapist sought to avoid Kirk's "re-traumatization" through contact with his family members pending his adjustment to foster care. As acknowledged by the GCDHHS supervisor, the suspension of respondent-mother's visitation with Kirk did not result from any inappropriate action by respondent-mother during the visits. The record also includes a letter from Kirk's therapist dated 9 January 2018 recommending that Kirk's supervised visits with respondent-mother and his siblings resume. Once again, there is no indication that this recommendation was based on concerns about respondent-mother's parenting ability.

The record demonstrates that respondent-mother resolved all of the apparent risks posed to her minor children by divorcing and obtaining a DVPO against

respondent-father, avoiding any subsequent abusive romantic relationships, completing therapy, obtaining suitable housing, cultivating greater independence and additional social support, and otherwise fully complying with her case plan. Dr. McColloch, who performed respondent-mother's psychological evaluation and parenting assessment in November 2016, concluded that "it is appropriate to return the children to this mother in the near future—if [respondent-father] or another abuser is not in the home. The current interventions appear appropriate for this mother's needs." Respondent-mother's March 2017 discharge summary from Peculiar Counseling & Consulting, PLLC, reported that she "has made tremendous progress" and "has met all [treatment] goals." Ms. Hudson likewise reported that she did "not recommend[] any further treatment" for respondent-mother, that respondent-mother "has made a great deal of progress," and that respondent-mother "presents as more confident, more knowledgeable about the issues that brought her children into foster care, and more prepared to resume full-time care of her youngest son." Respondent-mother's treatment providers were thus consistent in their assessment of her positive response to treatment and her prospects for resuming a parental relationship with Kirk.

### 5. Housing and Home Environment

Respondent-mother also contests several of the trial court's findings of fact related to her housing and home environment. Although the trial court acknowledged that the physical structure of respondent-mother's three-bedroom townhouse

"provides an appropriate environment for the juvenile[,]" the trial court's findings of fact refer to several episodes reflecting respondent-mother's alleged inability to maintain a suitable home environment for Kirk.

The trial court found that respondent-mother currently shared her residence with her adult daughters Brooke and Becky. The trial court then recounted a series of incidents arising from this living arrangement, stating as follows:

> 26. On December 18, 201[8], a GCDHHS social worker made an unannounced visit and noted the following concerns regarding the cleanliness of the home: overflowing trash can, kitchen sink full of dirty dishes, unkempt floors and grimy bathroom fixtures. The Mother utilizes a cleaning service that had just cleaned the home the day before on December 17, 2018. The GCDHHS social worker voiced concerns regarding the condition of the home since the service had just been at the home twenty-four hours prior. The social worker also expressed concerns that the other adult occupants of the home were not contributing to home maintenance. The Mother informed the social worker that her two adult daughters were only responsible for cleaning their individual rooms. The Mother was responsible for the other areas of the house.
>
> . . . .
>
> 33. . . . The daughters brought dogs into the home *against the Mother's preference and her expressed dislike of dogs. The dogs eventually had to be given away because her daughters did not adequately care for the animals. It was reported that one of the daughters had allowed a boyfriend to move in.* The Mother denies that the boyfriend resided there. Upon further research, GCDHHS was able to verify the boyfriend's criminal record which was not favorable. *Until the unannounced home visit* [on *18 December 2018*]*, the daughters were not required to assist in home maintenance and apparently were not required to clean behind themselves.* The Mother has since discussed home

maintenance with her daughters and has divided housekeeping tasks among the three of them.

    34.    Within the last few months, one of the daughters was attacked [at] the Mother's residence by a neighbor for whom the daughter had babysat. *Notwithstanding that the Mother is not currently permitted to have minor children in her home, the Mother did nothing to protect her daughter or stop the attack from occurring.* The identity and behavior of occupants, potential occupants and visitors in the Mother's home is pertinent and necessary to [e]nsure the safety of everyone in the household. *It is essential that the Mother exercise dominion and authority over her household. Thus far, the Mother considers the needs and preferences of everyone else superior to her own. The Mother cannot maintain a safe, stable environment for the juvenile if she retains this conciliatory attitude. The Mother needs to know and understand who is in her home as well as the individual's stated purpose there. The Mother cannot ensure and has not demonstrated that her home functions according to the Mother's desires. Until the Mother is able to demonstrate that, the juvenile would be subject to danger and harm if the juvenile were returned to the Mother's care.*

(Emphases added). Respondent-mother takes issue with the italicized portions of these findings.

With regard to Brooke's and Becky's cleaning responsibilities in the home before the GCDHHS home visit on 18 December 2018, the evidence as to this issue was that respondent-mother did, in fact, require her daughters to keep their own rooms clean. As to the presence of dogs in the home, respondent-mother points to evidence demonstrating that she mandated that Brooke and Becky keep the two dogs caged and out of her way while she was downstairs. Moreover, when her daughters failed to take care of the dogs to her satisfaction, she required them to give the dogs

away. Furthermore, it is not apparent from the trial court's order how the presence of the dogs gave rise to a likelihood that Kirk would be neglected.

With regard to the findings of fact concerning Brooke's boyfriend, respondent-mother testified that the boyfriend never actually moved into the residence and was not allowed to visit after she learned of his criminal record. A report submitted by social worker Cynthia Johnson indicated that Brooke's boyfriend was "living on and off at the home" during December 2017 and that respondent-mother initially "didn't really have knowledge that he had been staying on and off in the home." Respondent-mother testified that she forbade him from visiting the home once she found out about his background. There is no evidence in the record suggesting that he continued to visit after she forbade him from doing so.

Respondent-mother also objects to finding of fact 34's depiction of an incident in July 2018 during which Brooke was assaulted outside of respondent-mother's residence by the mother of a child that Brooke had been babysitting. The GCDHHS supervisor testified that the child's mother came to the residence after the child told her that Brooke had struck her with a shoe. During the incident, the mother punched Brooke in the face and hit her with a shoe several times before being restrained by Becky. Respondent-mother subsequently reported the incident to GCDHHS, informing GCDHHS that she encouraged Brooke to file criminal charges but that Brooke refused.

Respondent-mother testified she had been upstairs with her door open while Brooke was babysitting the child downstairs. She was unaware that the child's mother had come to the residence until she "heard major commotion outside [her] window," at which time she "went downstairs and outside." By the time respondent-mother reached the scene of the incident, the child's mother was gone. We are unable to find any evidence in the record to support the trial court's statement in finding of fact 34 that respondent-mother was not permitted to have minor children in her home. Furthermore, it is unclear what respondent-mother could have done to prevent this incident from occurring.

The remainder of finding of fact 34 consists of a series of generalizations or inferences drawn by the trial court. It is the province of the trial court when sitting as the fact-finder to assign weight to particular evidence and to draw reasonable inferences therefrom. *In re D.L.W.*, 368 N.C. at 843, 788 S.E.2d at 167–68. Such inferences, however, "cannot rest on conjecture or surmise. This is necessarily so because an inference is a permissible conclusion drawn by reason from a premise established by proof." *Sowers v. Marley*, 235 N.C. 607, 609, 70 S.E.2d 670, 672 (1952) (citations omitted). Accordingly, an appellate court may review the reasonableness of the inferences drawn by the trial court from the evidence.

We conclude that the majority of the trial court's inferences in finding of fact 34 are based merely on conjecture. The incidents described in the trial court's findings of fact do not give rise to a reasonable inference that respondent-mother's

"conciliatory attitude" renders her unable to "maintain a safe, stable environment for [Kirk]," or that "[Kirk] would be subject to danger and harm if . . . returned to the Mother's care."

As for the cleanliness issues identified by the trial court, we do not believe that they are sufficiently indicative of respondent-mother's inability to control her household as to support a conclusion that a likelihood of future neglect exists. Although the GCDHHS social worker found respondent-mother's residence cluttered and dirty on one occasion, the evidence also shows that respondent-mother promptly addressed the issue by assigning Brooke and Becky additional cleaning responsibilities. The trial court's findings of fact show that respondent-mother was employing a cleaning service for her residence prior to this incident, and there is no evidence that the cleanliness of the home remained a problem at the time of the termination hearing in March 2019. Although the trial court noted that cleanliness concerns were the subject of several CPS reports filed about the family in Orange County between 2003 and 2012, no such concerns were raised in any of the CPS reports received by GCDHHS between 2014 and 2016. Moreover, a lack of cleanliness in the home was not a cause of Kirk's adjudication as a neglected and dependent juvenile in 2016.

The remaining incidents cited in the trial court's findings of fact do not support the larger inferences drawn by the trial court about respondent-mother's ability to protect Kirk or provide him with a safe home environment. The findings of fact show

that respondent-mother tried to accommodate Brooke's and Becky's desires to have dogs but then required the dogs to be given away when her daughters proved unable to care for them. Respondent-mother also barred Brooke's boyfriend from the residence upon learning of his criminal history. Neither of these events is sufficient to support the trial court's conclusion that respondent-mother is unwilling or unable to control her household so as to prevent harm to Kirk. Likewise, the attack on Brooke in 2018 was an isolated incident occurring eight months prior to the termination hearing. We see nothing inherently dangerous in respondent-mother's decision to permit her adult daughter to babysit a nine-year-old girl. Nor does the record contain any evidence that respondent-mother possessed any ability to predict or prevent the incident involving Brooke and the child's mother.

### B. Conclusions of Law/Ultimate Findings

The trial court made the following ultimate findings in support of its conclusion of law that "[g]rounds exist to terminate the parental rights of [respondent-mother] pursuant to N.C.G.S. §[ ]7B-1111(a)(1)," all of which are contested by respondent-mother:

> 36.　　The Mother's [CPS] history alone, which dates back to 2000, supports the likelihood of repeat[ed] neglect. . . .

> 37.　　The Mother has not demonstrated the ability to care for the juvenile without GCDHHS'[s] involvement. The Mother has shown a selfish preoccupation with her romantic attachments even when those attachments are unhealthy and harmful to the Mother and her children. The Mother's mindless attachments will in all likelihood

subject the juvenile to repeated harm and result in the juvenile's eventual removal. The juvenile has dealt with enough instability already in his young life.

. . . .

40.     Based    on    the    Mother's . . .    inability    to demonstrate an ability to correct the conditions that led to removal the probability of repetition of neglect is high. . . . [T]he neglect continues to date and there is a strong likelihood of the repetition of neglect if the juvenile is returned to [the Mother].

We agree with respondent-mother that the findings of fact in the trial court's termination order that are actually supported by evidence of record are insufficient to support the trial court's ultimate finding that there was a likelihood of repetition of neglect. Accordingly, we hold that the trial court erred in determining that grounds existed for termination under N.C.G.S. § 7B-1111(a)(1).

We note that the above-quoted portion of finding of fact 36 represents a misunderstanding of the applicable legal standard for establishing future neglect for purposes of N.C.G.S. § 7B-1111(a)(1). "Termination of parental rights for neglect may not be based solely on past conditions which no longer exist." *In re Young*, 346 N.C. 244, 248, 485 S.E.2d 612, 615 (1997). The trial court may not rely upon a parent's history alone to find a likelihood of future neglect but "must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect. [One] determinative factor[ ] must be . . . the fitness of the parent to care for the child *at the time of the termination proceeding*." *In re Ballard*, 311 N.C. at 715, 319 S.E.2d at 232 (citation omitted). "If past neglect

is shown, the trial court also must then consider evidence of changed circumstances." *In re M.A.W.*, 370 N.C. 149, 152, 804 S.E.2d 513, 516 (2017).

In past cases involving families with a history of domestic violence, this Court has determined that a continued likelihood of future neglect is present when the parent continues to participate in domestic violence, fails to truly engage with her counseling or therapy requirements, or fails to break off the relationship with the abusive partner. For example, in *In re D.L.W.*, we considered whether the trial court erred by terminating the parental rights of a mother on the basis of neglect where the family had a history of "significant domestic violence between the parents." 368 N.C. at 836–37, 788 S.E.2d at 164. After the initial neglect adjudication and the removal of the juveniles from the mother's care, the mother's case plan required her to participate in counseling and remedy the domestic violence issues that were endangering her children. *Id.* at 838, 788 S.E.2d at 164.

The Court ultimately held that a likelihood of future neglect existed because (1) the trial court "received police reports and heard testimony regarding [the mother's] participation in multiple incidents involving domestic violence since the 2013 adjudication and removal of the juveniles"; (2) the mother "had not articulated an understanding of what she learned in her domestic violence counseling sessions"; and (3) the mother "continued in a relationship with the Respondent Father" despite the "ongoing domestic violence" between them. *Id.* at 843–44, 788 S.E.2d at 167–68; *see also In re D.W.P.*, 373 N.C. 327, 334, 838 S.E.2d 396, 402 (2020) (finding a

likelihood of future neglect based on the mother's failure to complete all required therapy and counseling, as well as her decision to "maintain[ ] a relationship with [her partner] despite domestic violence incidents").

In contrast to those cases, respondent-mother here has not been involved in any reported incidents of domestic violence since her separation from respondent-father. As discussed above, following the removal of Kirk from her care in 2016, respondent-mother moved out, separated from respondent-father, and ultimately divorced him in April 2018. She also obtained a DVPO against respondent-father on 22 February 2017 and renewed the DVPO through February 2021. In addition, respondent-mother fully completed all of the therapy and counseling courses required by her case plan. Respondent-mother also devoted hours to writing up a detailed safety plan for Kirk in anticipation of regaining custody of him. In this safety plan, she acknowledged her role in failing to protect the children from the prior abuse by respondent-father and stated that she found her children "IN NO WAY responsible for what they experienced." She articulately detailed the lessons she learned during counseling, and her safety plan for Kirk included high levels of supervision and structure, educational and extracurricular activities, and steps for avoiding "triggers" that may remind Kirk of prior trauma, including ensuring that respondent-father remains "blocked on all avenues" of potential contact with Kirk or other family members. In addition, each of her care providers stated that respondent-mother had satisfactorily addressed all concerns about her ability to safely and effectively parent

her children and required no further counseling.

The trial court's finding of a likelihood of repetition of neglect in the future crosses the line separating a reasonable inference from mere speculation. Accordingly, we hold that the trial court erred in concluding that respondent-mother's parental rights should be terminated on the basis of neglect under N.C.G.S. § 7B-1111(a)(1).

## II.  Adjudication of Dependency

Respondent-mother also challenges the trial court's adjudication of dependency under N.C.G.S. § 7B-1111(a)(6) as an additional ground for termination. Subsection 7B-1111(a)(6) authorizes the termination of parental rights in cases where

> the parent is incapable of providing for the proper care and supervision of the juvenile, such that the juvenile is a dependent juvenile within the meaning of [N.C.]G.S. [§] 7B-101, and that there is a reasonable probability that the incapability will continue for the foreseeable future. Incapability under this subdivision may be the result of substance abuse, intellectual disability, mental illness, organic brain syndrome, or any other cause or condition that renders the parent unable or unavailable to parent the juvenile and the parent lacks an appropriate alternative child care arrangement.

N.C.G.S. § 7B-1111(a)(6); *see also* N.C.G.S. § 7B-101(9). As the Court of Appeals has held, in order to sustain an adjudication of dependency, the trial court's findings of fact must establish "both (1) the parent's [in]ability to provide care or supervision, and (2) the [un]availability to the parent of alternative child care arrangements." *In re P.M.*, 169 N.C. App. 423, 427, 610 S.E.2d 403, 406 (2005).

Respondent-mother contests the trial court's ultimate conclusion of law in support of its adjudication under N.C.G.S. § 7B-1111(a)(6), which was based on the following findings of fact:

> 42. [The Mother] is incapable of providing a safe, permanent home for the juvenile. Although the Mother has participated in individual therapy, there is no clear, convincing evidence that the Mother has incorporated the knowledge or techniques obtained through therapy into her everyday life. It is concerning to this [c]ourt that Ms. Hudson, the therapist, indicated that there were pertinent issues that were not discussed during the course of the therapeutic relationship between the Mother and the therapist. . . . Although the Mother initiated divorce proceedings, obtained a 50-B Domestic Violence Protective Order and renewed the protective order twice, the [c]ourt is concerned about the Mother's involvement in yet another relationship [i.e., with Mr. Westray] since the juvenile's removal in 2016 without addressing adverse issues from her prior relationships. The concerns and red flags raised in this new relationship causes the [c]ourt to question the Mother's judgment. The Mother has not recommended anyone else to provide appropriate alternative care for the juvenile.
>
> . . . .
>
> 46. Grounds exist to terminate the parental rights of [the Mother] pursuant to . . . [N.C.G.S.] §[ ]7B-1111(a)(6) of the North Carolina General Statutes.

Based on our thorough review of the record, we conclude that the trial court erred by determining that respondent-mother was incapable of providing a safe, permanent home for Kirk. As set out above, the record shows that respondent-mother—among other things—eliminated the threat posed to Kirk by respondent-father, confronted her own history of violent domestic relationships to the satisfaction

of her multiple treatment providers, displayed appropriate parenting techniques during her visits with Kirk, and obtained a suitable residence with ready access to transportation and social support.

We are unable to agree with the trial court that the isolated incidents referenced in its termination order are sufficient to satisfy the requirements of N.C.G.S. § 7B-1111(a)(6). Accordingly, based on our careful review of the record, we hold that the trial court erred by terminating respondent-mother's parental rights on the ground of dependency.[4]

## Conclusion

For the reasons set out above, we reverse the trial court's 8 May 2019 order terminating respondent-mother's parental rights.

REVERSED.

---

[4] Respondent-mother also asserts that the trial court abused its discretion by determining that it is in Kirk's best interests for her parental rights to be terminated. Having concluded that the trial court erred by finding the existence of grounds to terminate respondent-mother's parental rights under N.C.G.S. § 7B-1111(a), however, we need not address this issue. *See In re Young*, 346 N.C. 244, 252, 485 S.E.2d 612, 617 (1997).